ABRAHAM V. VAN FLEET, JOHN T. BIRD, HENRY C. PITNEY
AND ROBERT S. GREEN, VICE-CHANCELLORS.

JOHN P. STOCKTON, attorney-general,

*v.*

THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, THE
PHILADELPHIA AND READING RAILROAD COMPANY and
THE PORT READING RAILROAD COMPANY.

Where it becomes necessary to compel obedience to its injunction or decree,
this court will appoint a receiver to take control of the defendants' property.

489

Upon order to show cause why a receiver should not be appointed to take charge of the road of the Central Railroad Company of New Jersey generally, or with such powers in relation to the transportation of coal over the Central railroad as may be necessary to enforce obedience to the injunctions of this court heretofore issued herein.

*Mr. Frederic W. Stevens, Mr. Barker Gummere* and *John P. Stockton, Attorney-General,* for the complainants.

*Mr. Robert W. De Forrest* and *Mr. Samuel Dickson,* for the Central Railroad Company of New Jersey.

THE CHANCELLOR.

The original information in this cause represented, in substance, that, in pursuance of a scheme between the defendants to restrict or prevent competition in the production and sale of anthracite coal, a staple commodity in this state, and thereby to effect an increase in the price thereof, on the 12th of February, 1892, the Central Railroad Company of New Jersey, a body corporate of this state, without authority of law, and in violation of the statute approved May 2d, 1885, entitled "An act respecting the leasing of railroads," through the instrumentality of a nominal lease to the Port Reading Railroad Company, another corporation of this state, and a tripartite agreement of even date with that lease, between it, the Port Reading Railroad Company, and the Philadelphia and Reading Railroad Company, indirectly leased its property and franchises to the latter company, which is a corporation of Pennsylvania, for the term of nine hundred and ninety-nine years, the purpose and effect of such lease being to combine producers and carriers of anthracite coal and to partially destroy competition in the production and sale of such coal, and thereby facilitate an increase in the price of that commodity, to the injury of the people of New Jersey.

Upon the presentation of that information, on the 31st day of May, 1892, an order was made that the defendants show cause why an injunction should not issue according to the prayer of

Stockton *v.* Central R. R. Co.

.the information, and that pending the hearing required by such
·order and the court's decision thereon, that the defendants and
.their officers and agents should, among other things,

" desist and refrain from operating their railroads in the State of New Jersey
in such manner as to diminish competition in the trade in anthracite coal, and
·desist and refrain from making, continuing or acting under any arrangements
or combinations with each other by contract or otherwise, having for their
object, effect or result either the creation of an artificial scarcity of such coal,
by limitation or diminution of the supply thereof, despite the natural law of
demand and supply, or having for their object, effect or result the arbitrary
increase of the price of such coal or the prevention of existing or future legiti-
.mate competition in the production, transportation or sale of such coal."

Argument upon that order was heard late in July, 1892, and
on the 29th of August following it was directed that an injunc-
tion issue to restrain the defendants from, among other things,

" further performing and carrying into effect the aforesaid lease and tripartite
agreement; and * * * the Port Reading Railroad Company and the
Philadelphia and Reading Railroad Company, their officers and agents, from
.continuing to control the roads, property and franchises of the Central Rail-
road Company of New Jersey, and from in anywise further intermeddling
therewith, and further restraining and prohibiting the Central Railroad Com-.
·pany of New Jersey, its officers and agents, from permitting the Port Reading
Railroad Company or the Philadelphia and Reading Railroad Company to use,
.control or operate its road, property and franchises; and enjoining and com-
manding the said The Central Railroad Company of New Jersey, its officers
:and agents, to again resume control of all its property and franchises and the
performance of all its corporate duties; and further restraining and prohibit-
ing the defendants * * * from making, continuing or acting under any
.arrangements or combinations with each other, by contract or otherwise, hav-
ing for their object, effect or result the control and operation of the Central
Railroad Company of New Jersey, its roads, property or franchises, by the
·other defendants, or either of them, and thereby effecting either the creation
of an artificial scarcity of such coal by limitation or diminution of the supply
.thereof, despite the natural law of demand and supply, or the arbitrary in-
.crease of the price of such coal or the prevention of existing or future legiti-
.mate competition in the production, transportation or sale of such coal."

By supplemental information, lately filed, the attorney-general
represents that both the restraining clause of the order of May
.31st and the injunction subsequently issued under the order of
August 29th have been disobeyed by the defendant companies,

in that, acting in combination with each other, they have so operated their railroads in this state as to diminish competition among them in the trade in anthracite coal, and have arbitrarily increased the price of such coal to the people in this state, as well the coal owned by the Central Railroad Company as that owned or controlled by the Philadelphia and Reading Railroad Company, by raising the prices thereof on or about the 1st days of July and September last, and having in other respects combined with each other to prevent competition in the production, transportation and sale of anthracite coal and to create a monopoly thereof. And he prays that a receiver may be appointed to take charge of the road of the Central Railroad Company of New Jersey generally, or with such powers in relation to the transportation of coal thereover as may be necessary to enforce obedience to the commands of such order and injunction, and such further decree as the court may make in the premises, and that he may have such further relief as to the court may seem equitable and just.

The present order to show cause is decided upon the pleadings and affidavits heretofore used in this cause, the supplemental information and affidavits thereto annexed, affidavits submitted in behalf of the Central Railroad Company of New Jersey and the Philadelphia and Reading Railroad Company and an agreement between coal companies and admission by the Central Railroad Company of New Jersey hereafter referred to.

By their affidavits, the defendants admit that the prices of coal were increased on the 1st of July and again on the 1st of September, but they deny that the increase was the act of the defendant companies. They claim that the responsibility for it is upon the Philadelphia and Reading Coal and Iron Company, which they insist is a distinct corporate entity of Pennsylvania, for whose acts they cannot be held responsible. They show that upon the service of the injunction which was issued under order of August 29th, the Central Railroad Company of New Jersey resumed possession of its property and the exercise of its franchises, and that although the Lehigh and Wilkesbarre coal has been shipped over railroads controlled by the Central Rail-

road Company of New Jersey and designated as its system, and other companies have increased freight rates upon similar shipments, the Central Railroad Company has refused to increase its freight rates on any coal consigned to points within this state.

It is an undisputed fact in the case, that the Central Railroad Company at the time of the lease to the Port Reading Railroad Company, was and since then has been the owner of a large majority of the shares of the capital stock of the Lehigh and Wilkesbarre Coal Company, a corporation of the State of Pennsylvania and a large miner and producer of anthracite coal, and that the Philadelphia and Reading Railroad Company then was and since then has been the owner of almost all the capital stock of the Philadelphia and Reading Coal and Iron Company, a Pennsylvania corporation of the same character, and that those two companies have represented, and yet represent, the coal investments and agencies of the last-named railroad companies, together constituting more than one-half the entire anthracite coal available to the people of this state.

By their affidavits the defendants affirmed that the Lehigh and Wilkesbarre Coal Company had sold its entire output of coal to the Philadelphia and Reading Coal and Iron Company, without reserving any right in itself to fix or control the price at which the coal should be sold by its vendee. Those affidavits were vague, in that they failed to disclose that the sale was by instrument in writing, and to refer to such instrument or to state the date of the sale, and upon the attorney-general's demanding information as to those particulars, the Central Railroad Company of New Jersey produced a written agreement between the coal companies, dated on the 30th day of April, 1892—that is, before either injunction was issued, but after the lease and tripartite agreement between the defendants—in which, after reciting that the Lehigh and Wilkesbarre company was the owner or lessee of coal lands and mines along the lines of the Lehigh and Susquehanna railroad, and that the Port Reading Railroad Company, as lessee of the Central Railroad Company, had arranged with the Philadelphia and Reading Coal and Iron Company for the transportation of all anthracite coal consigned by

Stockton *v.* Central R. R. Co.

the last-named coal company over the Lehigh and Susquehanna
and New Jersey Central railroads during the lease to the Port
Reading Railroad Company, and that it was proposed that the
Lehigh and Wilkesbarre Coal Company should sell and deliver
the entire product of its collieries to the Philadelphia and Read-
ing Coal and Iron Company, to be shipped to market over the
Lehigh and Susquehanna and New Jersey Central railroads, it
was agreed, among other things, that the Lehigh and Wilkes-
barre Coal Company did thereby sell its entire output of coal,
both present and future, to the Philadelphia and Reading Coal
and Iron Company, for defined percentages of the prices for
which the latter company may sell the coal, saving, however, its
right to suspend deliveries of coal if the percentages should at
any time not be sufficient to pay the cost of mining, and for rea-
sonable royalties, and that the purchaser would supply the seller
with cars for the transportation of "such an amount of anthra-
cite coal as it can produce from said collieries as a whole, by
working the same for as many days and to as full a capacity in
each month as the Reading Company works its own collieries;"
that if independent collieries on the Lehigh and Susquehanna
railroad should cease to work (using the language of the agree-
ment),

"the Lehigh and Wilkesbarre Company may supply coal in their place to an
extent not exceeding a certain proportion of the whole amount of coal mark-
eted from the anthracite region; that the sizes of the coal to be delivered to
the purchaser shall be restricted to an indicated proportion of the sales by the
purchaser; that the coal sold shall pass to market over the Central Railroad
of New Jersey system; that this contract shall be binding upon and inure to
the benefit of the parties hereto, and their successors and assigns, respectively,
for and during the period of nine hundred and ninety-nine years from the
date hereof, unless the said lease of the Central Railroad Company of New
Jersey to the Port Reading Railroad Company shall be canceled or annulled
before the termination of that period, and that in that event this contract
shall, at the option of either party thereto, and upon written notice by such
party to the other of its intention to exercise that option, cease to be in force
ɛt and upon the termination, cancellation or annulment of the said lease."

The agreement was executed in behalf of the Lehigh and
Wilkesbarre Coal Company by its president, J. Rogers Max-

Stockton *v.* Central R. R. Co.

well, who then was and now is also the president of the Central Railroad Company of New Jersey, and in behalf of the Philadelphia and Reading Coal and Iron Company by A. A. McLeod, its president, who was then and now is also the president of the Philadelphia and Reading and Port Reading Railroad Companies.

It appears that the method of selling coal mined by the companies named was through the instrumentality of salesagents; that when the agreement referred to was entered into, one John F. Wilson was the salesagent of the Lehigh and Wilkesbarre Coal Company; that on the 1st of May, 1892, Wilson resigned that position, and Percy B. Heilner, who had theretofore been the salesagent for the Philadelphia and Reading Coal and Iron Company, assumed the sales of the coal produced by the Lehigh and Wilesbarre Coal Company and other miners along the line of the Lehigh and Susquehanna railroad, styling such coal as the Lehigh and Wilkesbarre Department of the Philadelphia and Reading Coal and Iron Company, and that he, together with agents of other coal-producing companies, on the 1st day of July and the 1st day of September, 1892, increased the price of coal substantially as alleged in the information.

Upon this state of facts the defendants urged that they could not be held responsible for the acts of the coal companies, which, being distinct corporate entities of another state, operating in that state through their own officers and agents, are not, in contemplation of law or in fact, within their control.

Upon the other hand, the attorney-general insisted that the defendant companies, the Central Railroad Company of New Jersey and the Philadelphia and Reading Railroad Company, being the substantial owners of the two coal companies, and, through their presidents, controlling them hitherto during the operation of said agreement concerning the output of the Lehigh and Wilkesbarre coal, were, in substance and effect, continuing and acting conjointly under an arrangement, in the use of their properties, the tendency and effect of which was the creation of an artificial scarcity of anthracite coal, by limitation of the supply thereof, or the control of such supply, so that arbitrary in-

crease in price of coal might be made and maintained, and the prevention of future legitimate competition might be accomplished, and that the agreement between the coal companies was but a device through which competition in the production and sale of coal might be stifled, persisted in by the real owners and controllers of the coal companies, the defendants herein, in flagrant and contumacious disregard of the injunction of this court. And he asked that a receiver might be appointed, to take possession of all the property of the Central Railroad Company of New Jersey, or with power to act in the same way that the Central Railroad Company of New Jersey might lawfully act in relation to its interests in the Lehigh and Wilkesbarre Coal Company, and in the railroads extending into the Lehigh and Wilkesbarre coal region, and for that purpose to take legal title to the stock of that coal company to which the Central Railroad Company of New Jersey holds title; and to do such further act, and have such further powers, as obedience to the decrees of the court might from time to time require. He urged that, in view of the agreement between the coal companies, the resumption of possession of its road by the Central Railroad Company of New Jersey, and its refusal to advance freight rates on coal, were mere outward exhibitions of pretended obedience to the injunctions, while the defendants continued their combination and reaped the pecuniary benefits from it under an agreement which apparently was studiously concealed from the court, until, in this proceeding, it was deemed useful as a defence, and even then withheld until his demand for definite information concerning the particulars of the sale of the Wilkesbarre output of coal made it evident that the defendants' interpretation of the agreement would not be accepted in place of the document itself.

In proof of his charge of deliberate concealment of that agreement, the attorney-general called attention to the fact that, in his original information, he alleged and charged that other instruments than the lease to the Port Reading Railroad Company and the tripartite agreement between the three defendants, made between them or between them and others, existed for the purpose of effectuating the combination charged, and investing

possession of the corporate powers, franchises, privileges and property of the Central Railroad Company of New Jersey, and the use and exercise thereof, in the Philadelphia and Reading Railroad Company, and prayed that such instrument or instruments might be disclosed in the defendants' answers, and that, in answering, the defendants, by general and literal denial, effectually concealed the existence of the agreement to which they now attach importance, although then it was most pertinently connected with the subject-matter of the court's inquiry. He pointed the court to such concealment as convincing proof of the insincerity of the defendant's attitude to the court, which, coupled with the covert devices heretofore disclosed in the case, which were resorted to by the defendants to disguise and conceal their violation of the law of this state, presented a sufficient reason why the court should possess itself of the corporate property of the Central Railroad Company of New Jersey far enough to insure obedience to its decrees.

In my former opinion in this case, I declared that for the substantial purposes of injury to the public by combination to stifle competition, and the attorney-general's suit to defeat such combination, the defendants are to be regarded in equity as the owners of the coal mines; not as holders of the legal title, but as having substantial control of the corporate entities which hold that title.

It was made quite apparent to me that the relation of the coal companies to the railroad companies is such that the same minds and wills which dictate the policy of the railroads, and decide what they shall do and what they shall not do, also, in virtue of the power given by the ownership of a majority of the stock of the two coal companies, which is the property of the defendants, dictate the policy and control the conduct of the coal companies; that the defendant railroad corporations and the two coal companies are, in short, guided, dominated and controlled by precisely the same governing power.

The terms of the agreement of the 30th of April, between the coal companies, coupled with proof of the ownership of the capi-

32

tal stock of those companies, and the fact that the executive offi-
cers of the railroad and coal companies were and are the same
persons, afford reliable ground for inference, if not presumption,
that this condition of affairs exists. The agreement was not
only executed by the presidents of the railroad companies, who
were also presidents of the coal companies, but its recitals ex-
pressly declared that shipments of coal by the Lehigh and
Wilkesbarre company were to be over the railroads of the system
belonging to the owner of the majority of its capital stock, and
not over railroads which would offer the most advantageous
facilities and the lowest prices for its transportation. It was
also predicated upon a lease between the defendants, and was
terminable with the annulment of that lease. It participated in
the scheme of the railroad companies to lessen and destroy com-
petition and increase the price of coal, in that it made provision
for a share in the profits of the execution of that scheme by
fixing a percentage of the proceeds of sale as the price to be paid,
from time to time, for its output, and in that it insured enhanced
prices, by reserving the right to suspend deliveries if, at any
time, the prices realized should not pay reasonable royalties and
the cost of mining, and in that it submitted to a restriction of
the output of the Lehigh and Wilkesbarre company, so that it
should correspond with the output from the collieries of the
vendee, thus enabling the latter to control the market supply.

It was thus made to appear that the same individuals, who
controlled the corporations under injunction, in virtue of the
power which properties of the enjoined companies give them,
controlled other corporations whose life is represented by those
properties, and used them to accomplish the very ends against
which the injunctions are aimed. These individuals professed
respect and obedience to the injunctions by causing the Central
Railroad Company of New Jersey to resume possession of its
tangible property, but they failed to terminate the agreement
which they had made through the power which the intangible
property of that company gave them and which most effectually
nullified the efficiency of those injunctions.

At this point the inquiry presented itself whether the proofs were sufficient to establish that the defendants, since the issuance of the injunctions, have possessed the power to terminate the agreement between the coal companies and convict them of a breach of the injunctions.

Whatever difficulty I have had in deciding this application has been with this question. I have not for a moment doubted the power of this court, where it is necessary to prevent the property of the defendant from use in the contrivance of devices to mislead and deceive the court and thereby defeat its injunction, to take control of that property through the instrumentality of a receiver. Indeed, the power of the court to appoint such a receiver, when the appointment is necessary to effectuate its decree, has not been disputed. Such power is so essential at times to the efficient exercise of the court's jurisdiction that it has become too well established either to be seriously questioned or to need citation of authority to support it. Out of consideration for property rights it is sparingly and cautiously exercised, but when execution of a decree depends upon its exercise the court will most certainly use it to the full extent that the exigencies of the case demands.

Since the hearing of this application the representation to me, under stipulation between counsel for the Central Railroad Company and the attorney-general, that the agreement between the coal companies has been terminated at the instance of the Central Railroad Company, has removed the necessity of further consideration of the proofs. That representation has a two-fold significance—*first*, it satisfies me that the railroad company did not exert, prior to the application, its entire power to secure obedience to the injunction, and, *second*, it evinces a disposition upon the part of that company to now render complete obedience to the court's writ. Therefore, as the situation now is, I perceive no necessity for the appointment of a receiver. Instead of so doing, in order that I may be completely and particularly informed touching present obedience to the injunction, I will refer it to a master, to inquire whether the injunction is now being obeyed in letter and in spirit. He will be empow-

ered to send for and examine the officers, agents, books and papers of the defendants.

Further order in the premises will be reserved until the coming in of his report.